Receipt Number
5760034

ORIGINAL 29

Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**TPS LOGISTICS, INC.,**           §
                                   §
    **Plaintiff,**         §
                                   §
    **vs.**               §
                                   §
**ATWOOD MOBILE PRODUCTS,**        §
**L.L.C., and INSIGHT EQUITY I, L.P.,** §
                                   §
    **Defendants.**        §
                                   §
                                   §

Case: 2:08-cv-10093
Judge: Rosen, Gerald E
Referral MJ: Whalen, R. Steven
Filed: 01-07-2008 At 02:59 PM
REM TPS LOGISTICS INC V ATWOOD MOBI
LE PRODUCTS, ET AL (DAT)

## DEFENDANTS ATWOOD MOBILE PRODUCTS LLC AND
## INSIGHT EQUITY I LP'S NOTICE OF REMOVAL

Pursuant to Sections 1334, 1441, 1446, and 1452 of Title 28 of the United States Code,

Defendants Atwood Mobile Products LLC and Insight Equity I LP (the "Defendants"), by and

through their counsel, hereby remove this action to the United States District Court for the

Eastern District of Michigan, which is the federal judicial district in which this action is currently

pending.

As grounds for removal, Defendants state as follows:

1.       On December 5, 2007, Plaintiff TPS Logistics, Inc. ("Plaintiff") commenced a

civil action in the Circuit Court for the County of Wayne, State of Michigan, styled *TPS

Logistics, Inc. v. Atwood Mobile Products, L.L.C. and Insight Equity I, L.P.*, Cause No. 07-

732157-CB (the "Complaint"). The Complaint alleges, *inter alia*, that the Defendants are liable

to the Plaintiff for breach of contract, specifically, a Logistics Management Services Agreement

(the "LMSA"). The parties to the LMSA, which is attached to the Complaint, are Atwood

Mobile Products, Inc. and the Plaintiff. Atwood Mobile Products, Inc. (the "Debtor") is

currently a debtor-in-possession in bankruptcy proceedings under Chapter 11, Title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware. That bankruptcy case, along with those of the Debtor's affiliated companies, is being jointly administered as Case No. 06-11202 (KJC) (the "Bankruptcy Case").

2.       On July 3, 2007, Defendant Atwood Mobile Products LLC agreed to purchase certain assets of the Debtor's bankruptcy estate under 11 U.S.C. § 363, subject to Bankruptcy Court approval. On August 15, 2007, the Bankruptcy Court held a hearing and entered an order approving the terms of the sale as set forth in the Asset Purchase Agreement between Debtor and Defendant Atwood Mobile Products LLC.

3.       The LMSA was *not* one of the contracts assigned to or purchased by Atwood Mobile Products LLC and therefore remains the property of the Debtor in its ongoing bankruptcy proceeding. By seeking to enforce the LMSA against Defendants, the Plaintiff seeks to circumvent 11 U.S.C. §§ 363 and 365, as well as the Bankruptcy Court's August 15, 2007 sale order. Defendants therefore intend to join the Debtor as an indispensable party under Fed. R. Civ. P. 19(a), but must first remove the action to this Court to prevent a violation of the Debtor's automatic stay under 11 U.S.C. § 362.[1]

4.       This case is removable under 28 U.S.C. §§ 1334(b), 1441, 1446, and 1452. 28 U.S.C. § 1441(a) states, in relevant part, that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed . . . to

---

[1] As will be set forth in more detail in the Defendants' pleading to join the Debtor as an indispensable party, Plaintiff's pleadings and exhibits allege actions taken by the Debtor before the Bankruptcy Court's entry of its sale order as a basis for the Defendants' alleged breach of the LMSA. Further, the LMSA is a contract directly with the Debtor and the services set forth therein were utilized by the Debtor after it filed its bankruptcy petition and prior to the asset sale. Venue is therefore proper in this Court under 28 U.S.C. § 1409(e) as the district in which the Plaintiff originally brought its claim in state court because Plaintiff's claims, based on Plaintiff's own pleadings, arose after the commencement of the Debtor's bankruptcy case due to the debtor's actions taken in the course of its business as a debtor-in-possession.

2

the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1334(b) states that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." Because Plaintiff's claims arise under and/or relate to the Debtor's Title 11 bankruptcy proceeding for the reasons set forth above, this Court would have original subject matter jurisdiction over this action under the provisions of 28 U.S.C. § 1331 and § 1334 if the action had originally been brought in federal court. Removal is therefore proper under 28 U.S.C. § 1441(a).

     5.     This Notice of Removal is timely under 28 U.S.C. § 1446(b) and Federal Rule of Bankruptcy Procedure 9027.

     6.     Copies of the Summons and Complaint which have been filed in the Wayne County Circuit Court action and served on the Defendants are attached as Exhibit A.

Respectfully submitted,

Eric S. Rosenthal
**Barris, Sott, Denn & Driker, P.L.L.C.**
211 West Fort Street, 15th Floor
Detroit, MI 48236-3281
(313) 965-9725
E-Mail: erosenthal@bsdd.com
(P24816)

and

Miles B. Haberer
Texas Bar No. 00793872
Jarrett L. Hale
Texas Bar No. 24046005
**Hunton & Williams LLP**
1445 Ross Ave., Suite 3700
Dallas, TX 75202-2799
(214) 979-3000
(214) 880-0011 (Fax)

**ATTORNEYS FOR DEFENDANTS ATWOOD
MOBILE PRODUCTS, L.L.C. and INSIGHT
EQUITY I, L.P.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this notice has been served on the following counsel of record via first class mail, postage prepaid, on this 7th day of January, 2008:

John M. Rickel
Rickel & Baun
P.O. Box. 36200
Grosse Pointe Farms, MI 48236-0200

Eric S. Rosenthal
**Barris, Sott, Denn & Driker, P.L.L.C.**
211 West Fort Street, 15th Floor
Detroit, MI 48236-3281
(313) 965-9725
E-Mail: erosenthal@bsdd.com
(P24816)

350464.01.doc



**STATE OF MICHIGAN**
**THIRD CIRCUIT COURT**



| | |
|---|---|
| **SUMMONS AND RETURN OF SERVICE** | 07-732157 CB  12/05/2007 |
| | JDG:SUSAN D BORMAN |
| | TPS LOGISTICS INC |
| | VS |
| | ATWOOD MOBILE PRODUCTS LLC |

COURT
ADDRESS: 2 WOODWARD AVENUE, DETROIT, MICHIGAN 48226

COURT
TELEPHONE NO. (313) 224-5243

THIS CASE ASSIGNED TO JUDGE: SUSAN D BORMAN          Bar Number: 13316

| PLAINTIFF | DEFENDANT |
|---|---|
| S LOGISTICS INC          PL 01 | VS  ATWOOD MOBILE PRODUCTS LLC      DF 002 |

**PLAINTIFF'S ATTORNEY**

JOHN M. RICKEL
(P. 19432)
PO BOX 36200
GROSSE POINTE FARMS , MI  48236-0200
313-882-0000

| **CASE FILING FEE** PAID | **JURY FEE** NO JURY DEMAND FILED |
|---|---|
| **ISSUED** 12/05/07 | **THIS SUMMONS EXPIRES** 03/05/08 | **DEPUTY COUNTY CLERK** OLIVER PAM |

*This summons is invalid unless served on or before its expiration date.          Cathy M. Garrett – Wayne County Clerk

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. YOU HAVE 21 DAYS after receiving this summons to file an answer with the court and serve a copy on the other party or to take other lawful action (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
☐ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.
☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.
☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.
The docket number and assigned judge of the civil/domestic relations action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

The action ☐ remains ☐ is no longer    pending.

I declare that the complaint information above and attached is true to the best of my information, knowledge, and belief.

Date  12/6/07

Signature of attorney/plaintiff

**COMPLAINT IS STATED ON ATTACHED PAGES. EXHIBITS ARE ATTACHED IF REQUIRED BY COURT RULE.**
If you require special accommodations to use the court because of disabilities, please contact the court immediately to make arrangement.

FORM NO. WC 101
REV. (3-98)    MC 01 (10/97)    **SUMMONS AND RETURN OF SERVICE**    MCR 2.102(B)(11); MCR 2.104, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206 (A)

STATE OF MICHIGAN
WAYNE COUNTY CIRCUIT COURT

TPS LOGISTICS, INC.
    Plaintiff

07-732157 CB 12/05/2007
JDG:SUSAN D BORMAN
TPS LOGISTICS INC
    VS
ATWOOD MOBILE PRODUCTS LLC

v.

ATWOOD MOBILE PRODUCTS, LLC and
INSIGHT EQUITY I L.P., jointly and severally,
    Defendants

_____/

## COMPLAINT

NOW COMES TPS Logistics, Inc. ("TPS"), by Rickel & Baun, PC, and says:

1. Plaintiff is a resident of Wayne County, and is / was disclosed paying Agent for Principal Atwood.
2. Defendant Atwood Mobile Products, LLC ("Atwood") is the successor to and purchaser of Atwood Mobile Products, Inc. assets out of the bankruptcy of Dura Automotive Systems, Inc. ("Dura") located in Rochester Hills, MI, and Atwood does mobile products sales and business operations in Wayne County, MI, including entering into the contract as amended which is the subject of this lawsuit.
3. Insight Equity 1 L.P. ("Equity") on information and belief is the controlling entity of Atwood, having provided the equity for purchase of, and management control of, Atwood.

## COUNT 1 – BREACH OF CONTRACT, BY ATWOOD AND / OR EQUITY AS ATWOOD'S CONTROLLING MANAGER

4. On or about September 24, 2002 Atwood Mobile Products, Inc. when owned by Dura entered into a contract with TPS to provide transportation service ("moves"), audit, paying, and other services regarding Atwood operations, including without limitation moves to Atwood facilities, and moves from Atwood facilities, to customers and others.
5. On June 27, 2007 pursuant to the Dura bankruptcy Atwood Director of Purchasing Neal Milewski requested and received from Vice President Jeff Lau at TPS, confirmation that in the event of sale of Atwood assets, that TPS would continue the "same Terms and Conditions of its current Operating Agreement" in representation of Atwood (the "New Agreement"). The President of Atwood, Tim Stephens, and Richard Kingdon, Executive Vice President of Atwood, and Cam Smith, Distribution Manager, also received notice / copy of that offer then or soon thereafter.

RICKEL & BAUN
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

EMAIL: rickelbaun@comcast.net   VIDEO TELECONFERENCING SERVER, PLEASE TELEPHONE FOR IP ADDRESS
P.O. BOX 36200, GROSSE POINTE FARMS, MICHIGAN 48236-0200, TELEPHONE 313/886-0200, FAX 313/886-0405

1

6. On or about August 27, 2007 Equity purchased the assets of Atwood from the Dura bankruptcy, and Tim Stephens and Cam Smith remained managers, providing continuity of notice.

7. Although no new complete contract was written nor signed (no legal counsel being involved at the TPS entity) from August, 2007 to present, pursuant to the June 27, 2007 offer which was within the knowledge of Tim Stephens, President, and Richard Kingdon, Executive Vice President originally of Equity, and Cam Smith, Distribution Manager, the New Agreement was ratified and confirmed by approximately One Thousand (1,000) moves with cost in the neighborhood of approximately Three Million ($3,000,000) Dollars being administered and computed in accordance with the terms and conditions of the original contract, but with the following modifications specifically agreed to by the parties:

    a. TPS negotiated 45 day credit terms with shippers (compared to prior 14 day credit terms), at the request of Atwood;

    b.TPS agreed to prepay from TPS resources small package delivery [Federal Express and UPS] prior to Atwood payment to TPS therefore [TPS normally does not pay as Agent prior to payment by the Atwood Principal, as a matter of internal control, to ascertain that the shipment was in fact made].

    c. Plaintiff at Plaintiff's cost, as part of its management fee, has engaged in activities to reduce the costs of Atwood, pursuant to the specific request of Atwood: e.g., A dozen carrier negotiations occurred resulting in advantageous pricing changes for the benefit of Atwood, at Atwood request.

    d. At the West Union, Iowa location, where ½ of the factory was Dura, and ½ was Atwood (approximately), Plaintiff revised Plaintiff's coding system to split Dura and Atwood shipments, changing billing and charging systems.

    e. TPS worked with creditors to establish credit for Atwood (the new LLC).

    f. Atwood had a number of dedicated equipment agreements, and TPS worked with Hazen and other companies as Equity closed and sold plants, to turn in the transportation equipment. Payroll intensive expense occurred for TPS in negotiating meaningful amendments to heavy duty carrier arrangements on behalf of Atwood.

8. The parties ratified and affirmed the said 2001 agreement but with the modifications indicated in paragraph 7 above through the approximately 1,000 transactions from August, 2007 through present in December, 2007.

9. Atwood had the right to terminate the said agreement at inception in August, 2007, but could not take actions to affirm the contract if Atwood intended to terminate the contract. Atwood did take approximately 1,000 actions in affirming / to affirm the said agreement, which continued into December, 2007.

10. By letter dated November 19, 2007, Atwood notified TPS of termination of the said agreement effective January 1, 2008 [although by its written terms the contract does not terminate until September 24, 2008], and by telephone

RICKEL & BAUN
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

EMAIL: rickelbaun@comcast.net   VIDEO TELECONFERENCING SERVER: PLEASE TELEPHONE FOR IP ADDRESS
P.O. BOX 36200, GROSSE POINTE FARMS, MICHIGAN 48236-0200, TELEPHONE 313/886-0200, FAX 313/886-0405

2

conversation with Jarrett Hale, Esq., representing Atwood / Insight -- on December 4, 2007, Jarrett Hale, Esq. indicated the termination is effective November 30, 2007, 4 days earlier.

11. TPS has / had six (6) dedicated employees to Atwood, 2 on site at Atwood, with non-compete employment agreements and termination severance provisions resulting in significant expense, and approximately 64 carriers in complex accounting and payment and transportation / contract(s) and relationships.

12. Atwood sent $316,233.51 to TPS which is approximately ½ the estimated $750,000 management fee for the time period to termination of the New Agreement, which could be a negotiated settlement of this matter / lawsuit.

WHEREFORE TPS requests such damages and costs as are just and equitable in excess of $25,000.00, for the wrongful termination of the said contract.

## COUNT 2 – IMPLIED CONTRACT / *Quantum Meriut*, BY ALL DEFENDANTS

13. Plaintiff restates paragraphs 1 -- 11 incorporated hereby.

14. It would be unjust and inequitable for Defendants to terminate the said contract prior to September 24, 2008 termination as provided in said contract, shifting economic burden to TPS, or alternatively, to fail to pay TPS its management fee, where Atwood at Insight's direction and control has accepted the benefits of the contracts and carriers and niche opportunities provided to Atwood by TPS.

WHEREFORE TPS requests such damages and costs as are just and equitable in excess of $25,000.00, for the wrongful termination of the said implied contract.

## COUNT 3 – TORTIOUS INTERFERENCE WITH EXISTING CONTRACTUAL [EMPLOYMENT] RELATIONSHIP(S), BY ALL DEFENDANTS

15. Plaintiff restates paragraphs 1 – 13 incorporated hereby.

16. Defendants while being aware of the existing employment contractual relationships (including non-compete covenants) of six (6) dedicated employees of TPS, two (2) of which employees were located at Atwood facilities, and contractual relationships with carriers, nonetheless have offered employment to one or more such employees, and / or carriers.

17. Such interference with existing contractual relationships causes damage to the business and operations of TPS.

WHEREFORE TPS requests such damages and costs as are just and equitable in excess of $25,000.00, for the wrongful termination of the said contract and tortuous interference in employment / carrier contract(s).

December 5, 2007                              Respectfully submitted,

John M. Rickel P19432

RICKEL & BAUN
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

VIDEO TELECONFERENCING SERVER: PLEASE TELEPHONE FOR IP ADDRESS
EMAIL: rickelbaun@comcast.net
P.O. BOX 16200, GROSSE POINTE FARMS, MICHIGAN 48236-0200, TELEPHONE 313/886-0200, FAX 313/886-0405

3

## LOGISTICS MANAGEMENT SERVICES AGREEMENT

This Logistics Management Services Agreement ("Agreement") is made on this 24th day of September, 2002 between TPS Logistics, Inc. (TPS) at 2931 East Jefferson, MI  48207 and Atwood Mobile Products, Inc. at 4750 Hiawatha Drive, Rockford, IL  61103-1298; 2433 Fremont St., Rockford, IL  61103; 1120 North Main St., Elkhart, IN  46517; 57912 Charlotte Ave., Elkhart, IN  46517; 1775 East US 20, LaGrange, IN  46761; 3196 Thompson Rd., Fenton, MI  48430; 12155 Magnolia Ave., Building #6, Unit D, Riverside, CA  92503; 6320 Kelly Willis Rd., Greenbrier, TN  37073; 1874 South Pioneer Rd., Salt Lake City, UT  84104 (collectively referred to as "Client").

**WITNESSETH:**

WHEREAS, TPS is engaged in the business of providing logistics management services; and

WHEREAS, Client is supplying TPS with selected data concerning shipment of all of its goods and materials (the "Transportation Programs"), and TPS has produced an analysis of the data supplied; and

WHEREAS, Client desires to use the services of TPS in connection with the Transportation Programs set forth in this Agreement.

NOW, THEREFORE, in consideration of the covenants and promises contained in this Agreement and other good and valuable consideration the receipt of which is hereby acknowledged, TPS and Client agree as follows.

**1.0     TPS SERVICES**

1.01     **Procurement and Negotiation of Rates:**  TPS will benchmark competitive costs and services for Client's freight transportation requirements with regard to the Transportation Programs. Continued analysis will be conducted as TPS and Client deem necessary to update rates or to reflect new transportation moves.  TPS will obtain and analyze market information and recommend carriers for particular routes for Client's confirmation (those carriers confirmed by Client for particular routes are hereinafter referred to as "Authorized Carriers").  TPS will enter into transportation contracts as Agent for Client with Authorized Carriers in connection with the Transportation Programs.  Such transportation contracts will not obligate Client to use the Authorized Carrier but will establish transportation rates and other transportation terms and conditions which will apply if such Authorized Carrier is used to service Client's transportation needs described in the transportation contract.  TPS will recommend for Client confirmation only those carriers who provide TPS with evidence of general liability insurance coverage. TPS will promptly notify Client of written termination of such coverage.  TPS will issue supplier routing instructions identifying Authorized Carriers.

1.02     **Audit and Payment:**  TPS will administer carrier rate and tariff filings for Authorized Carriers and may use electronic scanning technology to verify and monitor contract compliance.  TPS will provide Client with freight bill audit, payment and processing services to support payments to Authorized Carriers in connection with the Transportation Programs.  Freight bills submitted by carriers in connection with the Transportation Programs who are not Authorized Carriers will be processed subject to the conditions described in Paragraph 3.03 of this Agreement.  TPS will build, update, and maintain Client's freight transaction database in connection with the Transportation Programs.  TPS will use its best efforts with Client's assistance and cooperation to assign account coding to freight bills.  TPS may utilize Electronic Data Interchange (EDI) to process freight invoices and extract movement details for Client.

1.03   **Special Services:**  TPS will provide a "Client Reference Guide" which will include the specific, special services, and operational procedures for the Transportation Programs.  In connection with the Transportation Programs, TPS will work with Client for the purpose of providing an engineering analysis area including, but not limited to multi-stop truckloads, consolidations, FOB term analysis, ltl, tl, air/ground expedite, courier, import/export, customs brokerage and facility location.  In addition, TPS agrees to work with Client on cost reduction opportunities with all areas of Client's transportation.

1.04   **Management and Reporting:**  For the Transportation Programs, TPS will provide Client with weekly reports that detail freight activity and billings and annual reports that summarize savings, lost opportunities and compliance performance.  TPS will provide one paper copy of these reports at no cost to Client.  TPS will submit to Client periodic reports of actual freight cost savings for the Transportation Programs ("Savings Reports") including a Savings Report for the twelve month period following the Effective date (defined below) and each consecutive twelve month period thereafter during the term of this Agreement ("Annual Savings Report").  Savings identified on each Savings Report will be calculated by TPS based on the difference between Client's historical freight costs as determined by TPS from data already available to TPS and the cost of Client's actual freight service.  Freight costs shall include, but not be limited to, carrier (less than truckload, truck load, air, expedite) charges, customs brokerage, courier, distribution centers, international air and ocean charges.

1.05   **Phasing in Services:**  TPS will immediately proceed to provide to Client the services described in Paragraph 1.01, 1.02, 1.03, and 1.04 of this Agreement as has been the case in the former Agreement.

## 2.0   TPS RESPONSIBILITIES

2.01   **Independent Contractor.**  The relationship of Client and TPS established by this Agreement is that of an independent contractor, and nothing contained in this Agreement shall be construed to (a) give either party the power to direct or control the day-to-day activities of the other, or (b) constitute the parties as partners, a joint venture, co-owners or otherwise as participants in a joint venture understanding.  Accordingly, TPS shall be responsible for the payment of all taxes arising out of TPS's activities in accordance with the Agreement, including, by way of illustration but not limitation, federal, state, and local income tax, social security tax, unemployment insurance taxes and any other taxes or business license fees as required.  TPS represents and warrants that no payment is due or shall become due to any third-party (other than as otherwise contemplated by this Agreement) in connection with TPS's performance pursuant to this Agreement in connection with TPS's performance of services pursuant to this Agreement.  TPS shall be solely responsible for, and shall indemnify and hold Client free and harmless from any and all claims (including workers' compensation), damages or causes of actions (including Client's reasonable attorneys' fees) arising out of the reckless acts and or gross negligence of TPS or TPS's employees or agents.

2.02   **Contracting and Payment.**  TPS, as an Agent, shall contract directly with all carriers, including Authorized Carriers, and shall be solely responsible for timely payments to such carriers following the procedures provided for in section 1.02 of this Agreement.  No freight invoice will be paid to any logistics service provider on behalf of any Client Company before the payment has been remitted to TPS by the Client as provided in 1.02 and 3.02.  Provided that Client has timely paid TPS for freight bills in accordance with section 1.02, TPS agrees to indemnify and hold harmless Client for any non-payment of correct freight bills.  TPS agrees to process and mail payment to the carrier or service provider within seven days (7) after the funds from the client are available to TPS.

2.03   **Staffing.**  TPS shall provide staff necessary to carry out its performance under this Agreement.  Such staff shall be properly qualified for each job assignment and shall be subject to approval by Client.  In the event that Client is unhappy with any of TPS's employees assigned to Client's project, Client shall notify the President of TPS who shall promptly assign a replacement employee acceptable to Client.

### 3.0    CLIENT RESPONSIBILITIES

3.01     Client hereby retains and appoints TPS as its sole and exclusive agent to provide Client the logistics management services for the Transportation Programs described in Paragraphs 1.01 through 1.04 above subject to the terms and conditions set forth in this Agreement.

3.02     Client agrees to remit to TPS each week during the term of this Agreement beginning the second week after the Effective date payment which will include all of Client's total verified freight charges for the Transportation and TPS management fee.  The TPS management fee shall be determined in accordance with the provisions of Section 9.0 of this Agreement entitled "Management Fee".

3.03     Client will make every effort to promptly implement or maintain the logistics program in accordance with TPS's recommendations in order to charge suppliers any increased cost resulting from not following shipping and routing instructions.  Use of carriers who are not Authorized Carriers will result in an industry standard audit of freight invoices in lieu of the normal audit.  TPS will manage the logistics related debit memos issued to the supplier.  Client agrees to use its best efforts to use Authorized Carriers charging below the average price of all carriers submitting rates as calculated by TPS.

3.04     Client agrees to permit the use of Client's data by TPS to conduct periodic consolidated market tests.  Client agrees to appoint one person to act as a single point of contact for TPS, who will have the power and authority to resolve disputes and make decisions in connection with all matters covered by this Agreement.

3.05     It is understood that TPS is not a carrier, does not take physical custody of freight and shall have no liability or responsibility for any loss and/or damaged or an insurable interest in Client's freight except payment as outlined in Section 2.02.  Client acknowledges that it is the carrier who bears the sole responsibility for the care and safe delivery of Client's freight.  Client agrees to file claims for loss and/or damage directly against any carrier used by Client within the time limits provided in such carriers' circulars, tariffs or contracts, and not against TPS.  TPS will be responsible for coordinating all documentation and preparing claims against carriers on behalf of Client.

### 4.0    CONFIDENTIALITY

4.01     Client and TPS agree not to disclose to any third party each other's trade secrets and data regarding rates and carriers or any proprietary information exchanged during the term of this Agreement.  Client agrees to protect all TPS trade secrets and practices, including descriptions of TPS systems and software, the TPS organization, the proprietary "look and feel" of reports or other documents, whether paper or electronic, provided by TPS to Client, and the proprietary TPS "way of doing business."  This obligation of confidentiality shall continue following the expiration or termination of this Agreement for as long as TPS maintains such information as confidential.  This period is not to exceed three years.

4.02     TPS shall maintain the confidentiality of Client's submitted information with the same degree of care that it exercises with regard to its own confidential material.  TPS may use selected subcontractors to provide data processing operations required pursuant to this Agreement, and Client consents to the use of such subcontractor, provided such subcontractor agrees to adhere to the confidentiality provisions set forth.  TPS may, at its option, add or delete such subcontractors.

4.03     TPS shall not publicize any aspect of its business relationship with Client or the database of Client's freight movements without the prior written consent of Client.

**5.0   FORCE MAJEURE**

Either party shall be excused from performance under this Agreement if it is prevented from carrying out its obligations by events beyond its reasonable control, including, but not limited to, acts of God or the public enemy, fire, flood, labor disorder, civil commotion, closing of the public highways, government interference or regulations or other contingencies similar to the foregoing beyond the reasonable control of the affected party.

**6.0   NOTICES**

Any notices provided for in this Agreement shall be considered given (i) to TPS if mailed by certified mail, postage prepaid to TPS Logistics, 2931 East Jefferson, MI  48207 to the attention of President, or (ii) to Client if mailed by certified mail, postage prepaid to Atwood Mobile Products, Inc. 1120 N. Main Street  Elkhart, IN  46514 to the Attention of Mark Knuth or President.

**7.0   TERM OF AGREEMENT**

The terms of this Agreement shall be for a period beginning on the date of this Agreement and ending four (4) years after the initial Effective Date  (the "Initial Term") with automatic extensions for additional one (1) year periods (an "Extended Term") unless either party notifies the other in writing of its intention not to extend this Agreement Thirty (30) days prior to the end of the Initial Term or the current Extended Terms anniversary date.  The Agreement will be reviewed annually within sixty (60) days of the anniversary date for any changes and/or modification agreed upon by both parties.

**8.0   PROPRIETARY INFORMATION**

Upon termination of this Agreement for any reason, Client agrees to deliver to TPS all information and materials which are proprietary to TPS which may be in Client's possession.  TPS agrees to deliver to Client any information identifies as proprietary to Client which may be in TPS possession.  Client may retain all original and/or copies of all documents in the possession of Client consisting of reports and data produced by TPS relative to the business of Client during the term of this Agreement which is not proprietary.

**9.0   MANAGEMENT FEE**

Beginning on the Effective Date, Client will pay TPS a Management Fee equal to four and one half (4.5%) percent of Client's Net Weekly Freights Cost for all of Client's transportation shipments which are part of the Transportation Programs beginning on the effective date of such program.  The term "Net Weekly Freight Cost" means all of the transportation costs for all shipment where Client is responsible for the charges for a shipment excluding TPS's Management Fee applicable to such shipment.  Provided that Client performs it's responsibilities under this Agreement, to the extent Total Savings for the Transportation Programs generated during the life of the contract are less than the Management Fee received by TPS, TPS shall refund the difference.  The total Management Fee is the limit of TPS's liability.

**10.0   MISCELLANEOUS**

10.01   If Client fails to pay TPS in accordance with the terms of this Agreement, TPS may, in addition to other legal remedies that TPS may have, at its sole operation, either suspend services under the Agreement or terminate the Agreement by sending written notice of termination to Client.

10.02   If TPS fails to pay Client's freight bills in accordance with the terms of this Agreement, Client may, in addition to other legal remedies that it may have, at its sole discretion, immediately terminate this Agreement by sending written notice of such termination to TPS.

10.03   In the event after twelve (12) months from the Initial Effective Date there are not measurable results, based on an established benchmark agreed to by TPS and Client, resulting from TPS's provision of services hereunder, Client will notify TPS in writing.  Within six (6) months of such

notification, TPS will cure any deficiency or provide written, verifiable data to support the savings claimed to have been generated as a result of TPS's services under the total relationship with TPS. In the event such savings are not verified or realized, Client may, at its sole discretion, immediately terminate this Agreement by written notice to TPS. Based on the study performed by TPS using the data and freight invoices provided by client, TPS has committed to a seventeen point three-one percent (17.31 %) net reduction in fiscal 2003.

10.04    This Agreement contains the entire understanding between the parties with respect to the subject matter treated herein. The terms of the Agreement shall supersede all prior agreements, written or oral, between the parties in connection with, relating to or arising out of the matters contained in this Agreement.

10.05    This Agreement may not be modified except in writing signed by both parties. This Agreement may not be assigned by either party without the prior written consent of the other.

10.06    TPS and Client will discuss any perceived deficiency in performance by either of them and will promptly endeavor to resolve all disputes in good faith. Notwithstanding the foregoing and except as otherwise provided in section 10.02 and 10.03 of this Agreement, if either party should persistently or repeatedly refuse or fail to perform any material duty, obligation or responsibility required by the terms of this Agreement, or persistently disregard any laws or regulations applicable to performance under the terms of this Agreement, the non-defaulting party may terminate this Agreement after filing with the other party sixty (60) days prior written notice of such termination during which time the defaulting party shall have an opportunity to correct such default.

10.07    Client agrees and acknowledges that TPS is providing freight management services to Client and makes no representations or warranties with respect to or on behalf of transportation companies, is not liable for the actions or omissions of any Authorized Carrier or any other transportation companies Client may confirm, engage or cause to be engaged after reviewing TPS analysis and recommendations, and that TPS makes no representations or warranties and bears no responsibility for availability of any carrier or rate. Client agrees that TPS's liability under this Agreement is limited to the amount of fees which Client has paid to TPS hereunder and that, in no case, shall TPS be liable for any lost profits or special incidental, or consequential damages of any kind or nature except such damages sustained by Client as a result of intentional misconduct or gross negligence of TPS.

10.08    This Agreement shall be governed by and construed in accordance with the internal law of the State of Michigan without giving effect to any choice of law provision thereof.

**11.0    Transferability**

This Agreement is non-transferable without express written consent of the party against whom it is to be enforced except as specifically provided herein.

**12.0    Severability**

If any portion of this Agreement shall be, for any reason, invalid or unenforceable, the remaining portion shall nevertheless be valid and enforceable and continued in effect unless to do so would clearly violate the express intentions of the parties as expressed herein.

**12.0    Effect of Waiver**

The waiver by either party if the breach of any provision of this Agreement shall not operate as or be construed to be a waiver of any subsequent breach of this Agreement.

09/24/02  *  Pages 5 of 6

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date set forth above.

**TPS Logistics, Inc.**

Name: BRANDON M STALLARD

Title: PRESIDENT ; COO.

Signature: Br M. Slth

Date: 9/24/02

2931 East Jefferson Ave., Detroit, MI  48207

**Atwood Mobile Products, Inc.**

Name: RICHARD JOHNSON

Title: DIRECTOR OF PURCHASIN

Signature: Richard Johnson

Date: 9-24-02

4750 Hiawatha Drive, Rockford, IL  611103-1298

09/24/02  *  Pages 6 of 6



LO ilSTICS, INC.

June 27, 2007


Mr. Neal Milewski
Director of Purchasing
Atwood Mobile Products
101 Simonton Ave
Elkhart, IN 46514



Dear Neal,


Please accept this letter as confirmation that in the event that Atwood Mobile Products or any of its divisions are sold, TPS will in principal agree to continue working under the same Terms and Conditions of its current Operating Agreement. If this were to transpire TPS is committed to advancing all current open proposals, as well as reviewing any new opportunities that may arise between our organizations as a result of this purchase. Additionally, you can rest assured that all existing pricing with TPS as well as the carrier base will be maintained.


Regards,

Jeff Lau
VP Operations
TPS Logistics



**LOGISTICS, INC.**

August 27, 2007


Mr. Tim Stephens
President
Atwood Mobile Products, LLC
1120 N. Main Street
Elkhart, IN 46514


Dear Mr. Stephens,

I very much appreciated the spirit in which you gathered the key partners and suppliers together this past Thursday. Once again, we are grateful for your leadership. We welcome the new spirit of decisive collaboration that was discussed. Frankly, this mirrors our culture and is the type of an environment where we are best suited to operate.

In short, we look forward to reintroducing a handful of initiatives that have been proposed to reduce Atwood's annual transportation. If approved, these would produce $435K in additional annualized bottom line savings. We have recently completed a dedicated operations optimization study where if more rigid production and delivery parameters could be met, an additional $600K can be taken out of the Dedicated Fleet operation. Although we are proud of the many saving initiatives that we have implemented in 2007, we stand prepared to implement additional savings in excess of $1MM annually. Please keep in mind that this does not include previous savings established or ongoing avoidance such as the fuel surcharge remaining well below industry standard.

Hazen Transportation has had a reduction proposal on the table since February awaiting Atwood approval. From a core rate perspective, we are confident that all other incumbent carriers and service providers will meet the 5% reduction target that I sensed was the challenge laid out in the Supplier Conference last week. Not only is our ability to assure these reductions based on our historic relationships and reputation with these service providers, but they also recognize the value of the long-term commitment being offered in exchange. TPS is willing to meet this request in our fee structure as well.

Based on my informal dialog with key carriers since our time together last week, we remain confident that the carrier base and service providers are willing to maintain industry standard payment terms. As a disclosed pay agent, we cannot make these commitments on a carrier's behalf, but we will certainly facilitate whatever terms that Atwood feels is reasonable.

August 27, 2007
Mr. Tim Stephens
Page Two

It meant a lot to me that Mr. Milewski pulled me aside to share that even after the multiple challenges and meetings to address historic concerns; there remains noise in the system surrounding the TPS value proposition.  As we often spearhead unpopular changes for the betterment of the overall Company, we are no stranger to being repeatedly challenged at some level of an organization. As you well know, wise decisions are made once the global cost is understood and measured.  That said, changes that force accountability and full disclosure while centralizing control can be difficult to make and are not soon forgotten.  As always, we look to your leadership and direction as to how to best address this further if it is deemed a worthy issue. Although we believe our full resource should be focused on moving forward, we welcome the opportunity to assemble our account managers that are on the ground in Tennessee, Iowa, and Indiana to join our executive team to again address any issues or openly clarify any concerns that may still exist.

In addition to working on the front end in designing out costs, we often serve as a change agent, where we are most effective when supported by strong management.  Unfortunately, we have been asked to report through and receive direction from three different individuals internally tasked with overseeing transportation in the past year.  We are currently receiving mixed direction on who will ultimately have the authority to serve in this role moving forward.  Our team has gained personal and professional respect for Mr. Milewski, Ms. Malek, and Mr. Smith. We are happy to serve under any one of these exceptional folks.  We do believe that clarification of a single point is critical in building on the platform that we have all worked so hard to establish.

I have asked that our folks not arrange any high level meeting until the direction of management is established.  I can only imagine how full your plate is through this transitioning period, but I do graciously ask that we sit down together sooner than later to affirm a united, deliberate and decisive direction moving forward.  I am entirely on your schedule.

I trust that you are well.

Kind Regards,

Brandon M. Stallard
President


Via:     Federal Express

/j



**LOGISTICS, INC.**

October 2, 2007

Mr. Cameron Smith
Atwood Mobile Products
1874 South Pioneer Rd.
Salt Lake City, UT  84104

Dear Mr. Smith,

We are especially grateful for your coordination and facilitation of our time together last week.  It was good to see you and find that you are well.

Our key folks that were present left that meeting with an even stronger spirit and determination to expedite our efforts to strengthen the transportation management platform that we have all worked so hard to develop.  The clarity of forward thinking leadership and renewed energy is a breath of fresh air.

I see that Jeff Lau has forwarded the information requested.  I trust that this appropriately serves your needs.

We look to you for direction in accelerating the advancement in the proposed initiatives to significantly reduce costs even further, as reviewed during our time together.  Please let us know what date works best for you all to reconvene.  Perhaps we can coordinate a meeting with the owner of Hazen Transportation around this same time advance further reductions and address any service concerns in this dedicated portion of the Atwood transportation spend.

Our full resource stands prepared to entirely support you in your new role.

Kind Regards,

Brandon M. Stallard

Cc:    Mr. Tim Stephens, AMP;  Mr. Richard Kingdon, AMP;  Mr. Mark Staggs;  Mr. Richard
        Smith, TPS;  Ms. Jeani Thomas, TPS;  Mr. Jeff Lau;  Mr. Cecil Stallard

Via:    Courier

/j



November 15, 2007


Mr. Neal Milewski
Atwood
1120 N. Main Street
Elkhart, IN 46514

Dear Neal,

We were discouraged by your call today suggesting that TPS accept a Management Fee of $60,000 per year to maintain our current service to Atwood. It is not reasonable or feasible that the current level of logistics management can be supported by your proposed flat monthly fee of $5,500, considering payroll, out of pocket and operating cost.

We trust that you and your counsel agree that there is very definitely a Logistics Management Service Agreement governing our current relationship that is in place through September of 2008. It is our intention to continue to support Atwood as agreed during which time we remain willing and able to be very aggressive in reducing our fee to extend this relationship. As a side note, a variable fee concept seems most appropriate apposed to a flat fee in light of the shifting volumes that are being experienced.

Please keep in mind that the several Logistics Managers, Account Mangers and dedicated staff both on-site in Elkhart as well as here in Detroit do have non-compete agreements in place with TPS.

We remain hopeful that a mutually beneficial means forward can be established as we remain dedicated to best protecting the interests of Atwood.

Regards,

Brandon


Cc:     Mr. John Rickel Esq.
        Mr. Cam Smith, Atwood


TPS LOGISTICS, INC. • 2931 EAST JEFFERSON, DETROIT, MI 48207 • P. O. BOX 44350, DETROIT, MI 48244
PHONE (313) 259-3226 • FAX (313) 259-3930

# Atwood Mobile Products

November 19, 2007


Brandon Stallard
TPS Logistics, Inc.
2931 East Jefferson
Detroit, MI 48207

Dear Brandon,

As a follow up to our conversation on Thursday, November 15, and your subsequent letter dated November 15, Atwood Mobile Products has decided to enter into an agreement with an alternate 3rd party logistics provider. This change will be effective January 1, 2008.

During our conversation and in your letter, you indicated that Atwood was under a contractual obligation to TPS through September 2008. It appears that Atwood, as the purchaser of assets from DURA in the bankruptcy sale, is only obligated to perform under contracts that were both specifically assumed by DURA and assigned to Atwood by order of the court under Section 365 of the Bankruptcy Code. In fact, Section 365 requires that the contracts be assumed and assigned by motion, notice and a hearing and subsequent order.

When Atwood purchased the DURA assets, it received an order authorizing assumption and assignment of certain contracts. That list of contracts is attached to the Asset Purchase Agreement (which is attached as an exhibit to the Sale order) as Schedule 2.1(c). As a matter of law, only those contracts itemized on that list can be deemed as assumed and assigned. The TPS contract is not on that list. As a result, TPS cannot enforce this contract against Atwood, and Atwood cannot enforce this contract against TPS. There simply is no privity of contract between the parties.

An Atwood representative will contact you over the next several days to communicate the transition and timing of activities related to the switch to our new provider. Brandon, Atwood Mobile Products employees, suppliers and customers appreciate the dedication and commitment TPS have provided over the last several years and hope that TPS will continue to support Atwood during the transition.

If you have any questions related to this matter please direct them to me at 574-266-4765.

Sincerely,

Neal Milewski
cc:     Mr. Tim Stephens, President - Atwood Mobile Products
        Mr. Richard Kingdon, Executive Vice President - Atwood Mobile Products
        Mr. Cam Smith, Distribution Manager
        Mr. Jarrett Hale, Esq.


**Atwood Center** · 1120 N. Main Street, Elkhart, IN 46514

| | | |
|---|---|---|
| Engineering | Phone: (574) 264-2131 | FAX (574) 206-9683 |
| Truck & Bus Group | Phone: (574) 264-2131 | FAX (574) 266-5418 |
| RV Sales | Phone: (574) 262-2655 | FAX (574) 262-2550 |

RICKEL & BAUN

A PROFESSIONAL CORPORATION

ATTORNEYS AT LAW

313/886-0000

HARRY RICKEL (1876-1965)
EDWARD P. MARSCHNER (1881-1960)
LEONARD A. BAUN (1923-1983)

MAILING ADDRESS
(ALL LOCATIONS)

P.O. BOX 36200
GROSSE POINTE FARMS, MI 48236-0200
TELEPHONE: 313/886-0000
FACSIMILE 313/886-0405
E-MAIL: rickelbaun@comcast.net
VIDEO TELECONFERENCING SERVER:
PLEASE TELEPHONE FOR IP ADDRESS
WEBSITE: rickelbaun.com

SATELLITE OFFICES

OAKLAND & MACOMB COUNTIES
TELEPHONE: 586/285-0000

HARBOR SPRINGS, MICHIGAN
TELEPHONE: 800/378-9007

DETROIT, MICHIGAN
TELEPHONE: 313/259-3500

December 4, 2007

Jarrett I. Hale, Esq.
Hunton & Williamson
Energy Plaza, 30th Floor, 1601 Bryan St.
Dallas, TX 75201-3402

Fax 214.880.0011

Re: Atwood LLC's Claimed Termination of Relationship with TPS Logistics, Inc.

Dear Jarrett:

This letter documents your representation in our 3pm telephone conversation today that the TPS Logistics, Inc. representation of Atwood, LLC is terminated effective November 30, 2007.

Very truly yours,

John M. Rickel

hp officejet 5500 seri   5510          Personal Pɪ ɪter/Fax/Copier/Scanner

Log for
313
12/5/2007 10:34AM

Last Transaction

| Date | Time | Type | Identification | Duration | Pages | Result |
|------|------|------|----------------|----------|-------|--------|
| 12/05 | 10:17a | Fax Sent | 12148800011 | 0:35 | 1 | OK |



# HUNTON& WILLIAMS

HUNTON & WILLIAMS LLP
FOUNTAIN PLACE
1445 ROSS AVENUE
SUITE 3700
DALLAS, TEXAS 75202-2799

TEL    214 • 979 • 3000
FAX    214 - 880 • 0011

## FAX

| | | |
|---|---|---|
| **TO** | **NAME:** | John Rickel |
| | **FIRM:** | Rickel & Baun |
| | **FAX NO.:** | 313.886.0405 |
| | **PHONE NO.:** | |
| | **PAGES (INCLUDING COVER):** | 3 |
| | **ORIGINAL TO FOLLOW IN MAIL:** | ☐ Yes  ☒ No |
| **FROM** | **NAME:** | Jarrett L. Hale |
| | **DIRECT DIAL:** | 214-979-2919 |
| | **DIRECT FAX:** | 214-979-3921 |
| **MESSAGE** | | |

IF PROBLEM WITH TRANSMISSION, PLEASE CONTACT OPERATOR AT 214 • 979 • 3000 .

| | | |
|---|---|---|
| **OPERATOR** | | |
| | **DATE:** | December 5, 2007 |
| | **TIME:** | |
| | **CLIENT/MATTER NAME:** | Insight Equity-Atwood |
| | **CLIENT/MATTER NO.:** | 63219-07 |

This communication is confidential and is intended to be privileged pursuant to the attorney-client privilege and the work-product doctrine. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone, and return the original message to us at the above address via the U.S. Postal Service.



HUNTON & WILLIAMS LLP
FOUNTAIN PLACE
1445 ROSS AVENUE
SUITE 3700
DALLAS, TEXAS 75202-2799

TEL      214 · 979 · 3000
FAX      214 · 880 · 0011

JARRETT L. HALE
DIRECT DIAL: 214-979-2919
EMAIL:  jhale@hunton.com

FILE NO: 63219-07

December 5, 2007

*Via Facsimile*

John Rickel
Rickel & Baun
Attorneys at Law
P.O. Box 36200
Grosse Pointe Farms, MI 48236-0200

Re:     Atwood Mobile Products, LLC; November 30, 2007 Correspondence from John M.
         Rickel to Neal Milewski

Dear Mr. Rickel:

We are in receipt of your letter dated December 5, 2007. Contrary to your allegation, no such representation was made during the call or otherwise. In fact, our request during the call that TPS provide services through November 30th, with compensation for such services, was immediately rejected by TPS's principal during the call. TPS's principal instead advised that TPS would provide no services and that TPS intended to retain as compensation for alleged damages any funds previously paid by Atwood to TPS for the benefit of carriers. Additionally, TPS refused to provide any information with respect to the amount of funds retained by TPS or the amount paid to carriers, and refused to provide copies of any correspondence delivered by TPS to the carrier.

Accordingly, this letter is a final request for (1) a complete accounting of all funds received by TPS from Atwood, and (2) either confirmation that all carriers have been paid all sums received by TPS from Atwood or a return of all such sums received by TPS from Atwood. If we do not receive such information or funds by the close of business Thursday, December 6, 2007, we will seek immediate relief before the bankruptcy court presiding over the chapter 11 bankruptcy case of Dura Automotive or such other forum as we deem appropriate.



John Rickel
December 5, 2007
Page 2

Sincerely,

Jarrett L. Hale

/vb

cc: Sean Ducharme
  Jeff Bast
  Eliot Kerlin
  Connery Searcy
  Rob Conner

# CIVIL COVER SHEET

County in which this action arose **WAYNE**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
TPS Logistics, Inc.

## DEFENDANTS
Atwood Mobile Products, LLC and Insight Equity I, L.P.

**(b)** County of Residence of First Listed Plaintiff   **Wayne County, MI**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   **Elkhart, Indiana**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED

**(c)** Attorney's (Firm Name, Address and Telephone Number)
John M. Rickel (P19432), Rickel & Baun, P.C., P.O. Box 36200,
Grosse Pointe Farms, MI 48236; (313) 886-0000

Attorneys (If Known)
Eric S. Rosenthal (P24816); Barris, Sott, Denn & Driker, PLLC,
211 W. Fort Street, 15th Floor, Detroit, MI 48226; (313) 965-9725

## II. BASIS OF JURISDICTION (Select One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Select One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Select One Box Only)

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☒ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### TORTS

**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

**PERSONAL INJURY**
- ☐ 362 Personal Injury— Med. Malpractice
- ☐ 365 Personal Injury— Product Liability
- ☐ 368 Asbestos Personal Injury Product Liabili

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### CIVIL RIGHTS
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

### PRISONER PETITIONS
- ☐ 510 Motions to Vacate Sentence

**Habeas Corpus:**
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

### FORFEITURE/PENALTY
- ☐ 610 Agriculture
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI ( 405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant
- ☐ 871 IRS — Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ ... uenced and ...anizations
- ☐ ... edit ...
- ☐ ... vice
- ☐ ... ommodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

Case: 2:08-cv-10093
Judge: Rosen, Gerald E
Referral MJ: Whalen, R. Steven
Filed: 01-07-2008 At 02:59 PM
REM TPS LOGISTICS INC V ATWOOD MOBI
LE PRODUCTS, ET AL (DAT)

## V. ORIGIN (Select One Box Only)

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statues unless diversity):
11 U.S.C. §§ 363 and 365 and 28 U.S.C., § 1334

Brief description of cause:  Breach of contract action in violation of 11 U.S.C. §§ 363 and 365.

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A CLASS ACTION
☐ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ YES   ☒ NO

## VIII. RELATED CASE(S) IF ANY
(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE   **January 7, 2007**

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG JUDGE _____

PURSUANT TO LOCAL RULE 83.11

1.          Is this a case that has been previously dismissed?                    ☐ Yes

                                                                                  ☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

2.          Other than stated above, are there any pending or previously          ☐ Yes
            discontinued or dismissed companion cases in this or any other
            court, including state court?  (Companion cases are matters in which   ☒ No
            it appears substantially similar evidence will be offered or the same
            or related parties are present and the cases arise out of the same
            transaction or occurrence.)

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

Notes:
This case was removed from Wayne County Circuit Court, Case No. 07-732157-CB